IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR THE SEARCH OF: | |
| RAYTHEON AIRCRAFT, COMPANY MODEL: HAWKER 800XP, SERIAL NUMBER: 258452 1999, AIRCRAFT TAIL#N356EJ | Magistrate No. 20-2138<br>[UNDER SEAL] |

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS

I, Eric Harpster, Task Force Officer of the Drug Enforcement Administration ("DEA"), United States Department of Justice, being duly sworn, state as follows:

I.  **AFFIANT BACKGROUND**

1. I am a Special Agent with the DEA and, acting as such, I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the United States Attorney General to request a search warrant.

2. I am also a detective with the City of Pittsburgh Police Department in addition to being a TFO with the DEA. I have been a law enforcement officer for the past 20 years.

3. I have been involved in narcotics-related arrests and the service of search warrants that resulted in the seizure of narcotics. In addition, I have been involved in the supervision of informants who provided information and assistance in drug trafficking investigations. During the course of my training and experience, I have become familiar with the methods associated with the distribution of drugs, the laundering of drug proceeds, and the organization of drug conspiracies.

1

4. Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by organized criminal enterprises, drug trafficking organizations, and street gangs to smuggle and safeguard controlled substances and firearms, to distribute, manufacture, and transport controlled substances, and to collect and launder related proceeds.

5. Through my training, knowledge, and prior experience in drug trafficking investigations and arrests, I am familiar with the actions, traits, habits, and terminology utilized by drug traffickers. I am familiar with the ways in which narcotics traffickers conduct their business, including methods of importing and distributing narcotics, money laundering, the use of cellular telephones and the internet to facilitate their illegal acts, and the use of numerical codes and code words to conduct drug transactions. Based on this familiarization, I know the following:

    a. Drug trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses, drug trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity;

    b. Drug traffickers and members of the organization arm themselves and their organization with firearms and ammunition to protect their drug trafficking activities; additionally, it is common for drug dealers to conceal contraband, firearms, and proceeds of drug sales in secure locations within their residences, vehicles and/or business for ready access;

    c. Drug traffickers use airplanes to move quantities of drugs and currency to other locations for storage and further distribution and use. Within an airplane, drug traffickers will often store quantities of drugs and currencies within luggage or other storage containers to avoid detection by law enforcement;

    d.  Drug traffickers use uninhabitable locations (for example, vacant dwellings, storage lockers, garages, etc.), often under another person's name, as "stash locations" for the storage of drugs and currency, as well as to process and package drugs for distribution. Your affiant also knows that houses and/or apartments within neighborhoods are often utilized as stash houses;

    e.  Drug traffickers often maintain financial records and financial instruments related to their drug transactions and the profits derived from those transactions including, but not limited to, currency, bank checks, cashier's checks, Western Union receipts, money orders, stocks, bonds, jewelry, precious metals, and bank and real estate records. Drug traffickers also frequently maintain books, records and other documents that identify and contain the names, addresses and/or telephone or pager numbers of associates in their drug-trafficking or money-laundering activities, including, but not limited to: address books, telephone books, and notes reflecting telephone numbers, and documents or other records relating to state court proceedings involving other co-conspirators. It is common for drug traffickers to conceal such items in secure locations within their residences, vehicles and/or business for ready access;

    f.  Drug traffickers commonly take or cause to be taken photographs and videos of themselves, their associates, their property and/or assets, and their drugs. They commonly maintain identification and travel documents, including, but not limited to, tickets, transportation schedules, passports, notes and receipts related to travel, luggage tags, and motel/hotel receipts. It is common for drug traffickers to conceal such items in secure locations within their residences, vehicles and/or business for ready access.

    g.  Individuals who traffic in drugs and/or commit money laundering offenses often use computers, including cellular devices, to maintain records of their assets, expenditures,

liabilities, properties, bank/brokerage accounts, safe deposit boxes, storage units, inventories, financial transactions, identification of associates, and even references to other illegal activities.

        h.      Your Affiant is aware through both training as well as experience gained through multiple narcotics investigations, the targets of those narcotics investigations utilize cellular telephones and electronic devices to not only arrange meetings with their drug customers but also speak with fellow co-conspirators as well as their drug sources of supply. Your Affiant is also aware that these targets also utilize multiple cellular telephones and electronic devices at one time in an effort to not only thwart detection by law enforcement but also to compartmentalize their drug trafficking customers to one phone and/or electronic device, their co-conspirators to another phone and/or electronic device, and their drug source of supply to yet another phone and/or electronic device.

        i.      Based upon my training and experience, I am aware that it is generally a common practice for drug traffickers to store the names and phone numbers of drug customers and photographs and video detailing illegal activities in cellular telephones and electronic devices. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier(s) and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

j.      Members of Drug Trafficking Organizations (DTO) often take group photographs with other enterprise members posing with paraphernalia, money and/or drugs. Many cellular telephones have a camera feature that is readily capable of capturing and storing these group photos.

k.      Members of DTOs often store each other's phone numbers and contact information in the directories of their cellular phones and/or electronic devices.

l.      Based on my experience and familiarity with cellular telephones, I am aware that the telephones have voicemail and telephone directory features, as well as camera features which allow the user to take photographs and store them in the cellular phone's memory card. Based on my experience and training, statements by other law enforcement officers, and personal observations, I know that because of the storage capacity of cellular telephones, the portability of cellular telephones, the ease with which information stored on a cellular telephone may be accessed and/or organized, and the need for frequent communication in arranging narcotics transactions, cellular telephones are frequently used by individuals involved in drug trafficking. In particular, I and other law enforcement officers have found that information frequently maintained on cellular telephones includes the contact numbers of other co-conspirators, contact numbers for narcotics customers and stored photographs of DTO activities. This evidence will come in the form of caller identification information, call log information, telephone numbers, address information, or other identification information, as well as opened and unopened voicemail and/or text messages, photographs, videos and information about access to the Internet.

m.      Members of DTOs routinely use multiple physical phones in succession as one breaks or the DTO feels that the number associated with the phone is compromised to Law Enforcement. The physical phone may no longer be an active communicative device, however

many times, these old phones are not discarded as they possess value to the DTO. The replaced device contains within it the contact information for drug customers of the DTO, and many times these phones are maintained as digital phone books should the new active phone become unusable or unavailable. Furthermore, these replaced phones are commonly kept in a relatively accessible location where either all or select members of the DTO can access the information within should it become necessary. As stated above, members of DTOs routinely take photographs and or memorialize other information of evidentiary value within these replaced phones. As such, it is common to recover a multitude of otherwise inactive phones especially at locations central to or important to the DTO.

n. Individuals who traffic in drugs and/or commit money-laundering offenses often place assets in corporations or businesses in order to avoid detection of these assets by government agencies.

o. Individuals who traffic in drugs and/or commit money laundering offenses often place their illegally obtained assets in "straw names" (the names of other individuals) in order to avoid detection of these assets by government agencies. Even though these assets are in the names of other individuals, the money launderers continue to use these assets and exercise dominion and control over them.

p. Individuals who traffic in drugs and/or commit money-laundering offenses must keep on hand large amounts of United States currency in order to maintain and finance their ongoing business.

q. Individuals who traffic in drugs and/or commit money laundering offenses often maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the ordering, sale, and distribution of their product where they can have ready

access to them. This record keeping also extends to cellular devices and other electronic mediums where drug traffickers will create and maintain records of criminal activity.

    r. Individuals who traffic in drugs and/or commit money laundering offenses conceal in their residences or place of business large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of the trafficking and/or laundering transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or the spending of large sums of cash derived from engaging in drug trafficking and/or laundering activities.

    s. When traffickers and/or money launderers amass large proceeds from their activities, they attempt to legitimize these proceeds.  To accomplish this goal, money launderers utilize domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts.

    t. The Currency Transaction Report (CTR) Internal Revenue Service (IRS) Form 4789, which is required to be completed and filed with the IRS by all financial institutions or places of business, on every currency transaction which exceeds $10,000.00 (unless the transaction is exempt), causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at a financial institution or place of business.

    u. In order to evade the filing of a CTR, drug traffickers often "structure" their currency transactions so that no single transaction exceeds $10,000.00, or they provide false or misleading information in an attempt to legitimize or conceal their ownership of the currency, or they conspire with money launderers to make the transaction appear as a financed purchase.

    v. Individuals who traffic in drugs and/or commit money laundering offenses usually maintain addresses or telephone numbers in books or papers, which reflect names,

addresses, and/or telephone numbers of their associates. These records are needed to keep track of persons involved in financial transactions, especially with regard to cash purchases.

   w. Individuals who traffic in drugs and/or commit money laundering offenses often use computers, including cellular devices, to maintain records of their assets, expenditures, liabilities, properties, bank/brokerage accounts, safe deposit boxes, storage units, inventories, financial transactions, identification of associates, and even references to other illegal activities.

   x. Individuals who traffic drugs and/or commit money-laundering offenses often have in their residences or places of business, firearms and other dangerous weapons. These weapons are used to protect and secure property, which may include, but is not limited to, jewelry, books, records, United States currency, real estate property, personal property, etc.

   y. I also know that drug traffickers may use residences other than their own in order to conceal or distance themselves from illegal activity.

  6. I am participating in an investigation into the possible trafficking of illegal narcotics on an airplane across state lines in violation of Title 21, United States Code, Sections 841, 843, and 846 in the Western District of Pennsylvania (Allegheny County) and elsewhere. As set forth below, there is probable cause to conclude that evidence of the above stated offenses will be found in the locations and vehicles more fully outlined below.

  7. I have personally participated in this investigation, and have also discussed this case with, and reviewed the reports of, other law enforcement officers who have been involved in this investigation or who have investigated members of this organization in the past. This Affidavit does not contain all of the information known to me regarding this investigation. I have included in this Affidavit only the facts which I believe are sufficient to support a probable cause finding for the issuance of the requested search warrants.

## II. SEARCH LOCATIONS SOUGHT WITHIN THIS AFFIDAVIT

8. Your Affiant is seeking a search warrant for the following locations: A RAYTHEON AIRCRAFT, COMPANY MODEL: HAWKER 800XP, SERIAL NUMBER: 258452 1999, AIRCRAFT TAIL#N356EJ ("**TARGET LOCATION**"), which is currently located at Pittsburgh International Airport for the items listed in ATTACHMENT B.

## III. PROBABLE CAUSE

9. On October 22, 2020, your affiant received information that a private airplane carrying narcotics was traveling from Houston, Texas to Pittsburgh, Pennsylvania.

10. Investigators obtained information that a private airplane that departed Houston, Texas was scheduled to arrive in Pittsburgh, Pennsylvania at approximately 9:30PM. Investigators also obtained information that allowed investigators to identify the airplane.

11. Investigators set up surveillance at the airport, and the airplane landed at Pittsburgh International Airport just after 10:00PM on October 22, 2020.

12. Allegheny County Police Officer Steve Dawkins and other accompanying officers approached the airplane soon after it landed. Officers spoke with the pilot and obtained written consent to search the plane. At that point, officers determined that the passengers on the plane had baggage in their possession. The passengers also admitted to smoking marijuana in the presence of their bags prior to departing Houston, Texas on the airplane.

13. After receiving consent from the pilot, Officer Dawkins brought K9 Officer Solo on to the airplane. K9 Officer Solo is qualified to detect marijuana, heroin, cocaine, ecstasy, and methamphetamine. K9 Officer Solo has been qualified for the last seven years and is certified on a yearly basis, with his certification expiring in January of 2021 as shown in Attachment C. K9 Officer Solo alerted on an area where two bags were located in the back of the passenger

compartment of the airplane and a second area where two bags were located in the front of the passenger compartment of the airplane.

14. Officer Dawkins is aware that K9 Officer Solo was indicating the presence of one of the illegal substances that he is qualified to detect.

WHEREFORE, given the above, your Affiant respectfully requests that the Court issue an order authorizing warrants allowing for searches of the above-referenced locations.

All of the above information is true and correct to the best of my knowledge, information and belief.

*/s/ Eric Harpster*
Eric Harpster
Task Force Officer
Drug Enforcement Administration

Sworn and subscribed before me, by telephone
pursuant to Fed. R. Crim. P. 4.1(b)(2)(A),
this 23rd day of October, 2020

_____
HONORABLE PATRICIA L. DODGE
United States Magistrate Judge
Western District of Pennsylvania